962 So.2d 649 (2007)
John Edward JACKSON, Jr., Appellant
v.
STATE of Mississippi, Appellee.
No. 2004-KA-01460-COA.
Court of Appeals of Mississippi.
February 27, 2007.
Rehearing Denied May 29, 2007.
*658 Charles E. Miller, Mccomb, attorney for appellant.
Office of the Attorney General by W. Daniel Hinchcliff, attorney for appellee.
Before MYERS, P.J., CHANDLER and ROBERTS, JJ.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. On February 12, 2004, a jury sitting before the Amite County Circuit Court found John Edward Jackson, Jr., a licensed Mississippi attorney, guilty of sale of marijuana within a correctional facility. The circuit court sentenced Jackson to three years in the Mississippi Department of Corrections' Intensive Supervision Program. The circuit court also ordered Jackson to pay a $25,000 fine and all court costs. Finally, the circuit court ordered Jackson disbarred pursuant to Mississippi Code Annotated § 73-3-41 (Rev.2004). Aggrieved, Jackson appeals and raises fifteen issues, listed verbatim:
I. THE EVIDENCE IS INSUFFICIENT TO SUPPORT CONVICTION PURSUANT TO THE INDICTMENT AND RELEVANT LAW. THE LOWER COURT ERRED IN NOT GRANTING A JUDGMENT NOTWITHSTANDING THE VERDICT PURSUANT TO RULE 50(B) OF THE MISSISSIPPI RULES OF CIVIL PROCEDURE.
II. THE COURT SHOULD HAVE GRANTED THE MOTION FOR JUDICIAL RECUSAL.
III. THE COURT SHOULD HAVE GRANTED THE MOTION FOR CHANGE OF VENUE.
IV. THE LOWER COURT ERRED IN NOT DISQUALIFYING THE DISTRICT ATTORNEY: (a) MISCONDUCT AS RELATED TO WITNESS TAMPERING, (b) DISCOVERY VIOLATION, (c) BIAS OF THE DISTRICT ATTORNEY'S GENERAL OFFICE, (d) VIOLATION OF BATSON RULE.
V. THE COURT ERRED [SIC] NOT GRANTING A DISMISSAL BASED ON JURY MISCONDUCT AND FAILURE TO RELEASE THE JURY AT A REASONABLE TIME.
VI. THE LOWER COURT ERRED BY ALLOWING THE VIDEO TAPE AND ILLEGAL SUBSTANCE AS EVIDENCE.
VII. THE COURT ERRED IN NOT GRANTING A DISMISSAL OR CONTINUANCE FOR [SIC] WITNESS FAILURE TO APPEAR.
*659 VIII. THE COURT ERRED IN ITS DENIAL OF CERTAIN JURY INSTRUCTIONS.
IX. THE COURT ERRED IN ALLOWING TESTIMONY OF [SIC] EXPERT ON [SIC] VIDEO TAPE.
X. THE BATSON RULE WAS VIOLATED AND THUS THE COURT ERRED IN ITS FAILURE TO FOLLOW THE LAW AS IT RELATES TO JURY SELECTION.
XI. THE DESTRUCTION OF THE PRIOR VIDEO TAPES WERE [SIC] IN BAD FAITH.
XII. THE LOWER COURT ERRED BY NOT DISMISSING THE INDICTMENT OR GRANTING A MISTRIAL WHEN IT ALLOWED TESTIMONY OF PRIOR BAD ACTS OF THE ACCUSED.
XIII. THE LOWER COURT [SIC] FAILURE TO GRANT [SIC] MOTION TO ADMIT PRIOR TESTIMONY OF [SIC] UNAVAILABLE WITNESS UNDER M.R.E. RULE 804(a)(5) AND 804(b)(1).
XIV. THE TRIAL COURT ERRED IN ITS RULING THAT AN OPINION AS T[O] THE TRUGH [SIC] AND VERACITY OF THE INFORMANT AND PROBATION OFFICER ARE NOT ADMISSIBLE.
XV. WHETHER THE SENTENCING CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT AND IS DISPROPORTIONATE UNDER [SIC] EIGHTH AMENDMENT.
Finding no error, we affirm.

FACTS
¶ 2. What eventually led to John Jackson's conviction began with his representation of Cedric Watson. As of the spring of 2003, Cedric Watson was housed in the Lincoln County jail. Charged with robbery and selling cocaine, Watson awaited trial. In late March of 2003, Watson retained Jackson to defend him against those charges. Jackson charged Watson $5,000, but Watson initially paid Jackson $500.
¶ 3. Watson did not bond out of jail. According to Watson, Jackson visited him frequently. Watson estimated that Jackson visited him two or three times each week. By the State's theory, Jackson was selling contraband items to Watson so that Watson could sell them to other inmates and, with the profits, pay Jackson's legal fees. Though Jackson has never admitted to such a scheme, he admitted that he brought Watson cigarettes and at least one cell phone. Jackson has consistently denied that he smuggled marijuana into the Lincoln County jail. Jackson's denial notwithstanding, the prosecution presented evidence that supports the following version of events.
¶ 4. The investigation of Jackson originated as a tip from an inmate to John Purser, the probation and parole officer assigned to Lincoln County. During April of 2003, Officer Purser received a phone call from a family member of Herbert Perkins. At that time, Perkins was a probationer housed in the Lincoln County jail. The caller informed Officer Purser that marijuana was present in the jail. The caller also implicated Watson. Officer Purser talked with Perkins and then met with Sheriff Lynn Boyte. As a result, authorities conducted a search of the jail. When authorities searched Watson, they found a bag of marijuana.
¶ 5. Authorities sought to determine just how Watson was getting marijuana into the jail. Immediately after one of Watson's attorney/client meetings with Jackson, authorities searched Watson and found cigarettes on him. The focus of the investigation turned towards Jackson. Watson agreed to assist with the investigation. *660 Over time, authorities videotaped several meetings between Watson and Jackson, but Jackson never gave Watson any drugs during those meetings. At least not until June 3, 2003.
¶ 6. On June 3, Jackson again went to the Lincoln County jail to meet with Watson. Upon notification, Captain Steve Rushing, a criminal investigator and a patrol captain with the Lincoln County Sheriff's Department, told Officer Phillip Thornton, a corrections officer, to retrieve Watson. Meanwhile, Captain Rushing went to the Intoxilyzer room and placed a videotape in the recorder.
¶ 7. By the time Captain Rushing was through, Officer Thornton had informed Watson of Jackson's arrival and escorted Watson to see Captain Rushing. Law enforcement officers from various agencies worked together to properly prepare Watson so they would preserve any evidence collected during the meeting. Captain Rushing searched Watson to ensure that Watson did not have any contraband materials with him. Satisfied, Captain Rushing gave Watson fifty marked one-dollar bills. Officer Thornton then escorted Watson to the Intoxilyzer room within the jail where Watson met with Jackson.
¶ 8. According to the prosecution's theory of the case, during that meeting, Jackson gave Watson two packs of cigarettes and some marijuana. In exchange, Watson gave Jackson the marked bills and concealed the marijuana in the waistband of his prison jumpsuit. Jackson then left the jail without further incident.
¶ 9. Watson and Jackson's entire meeting was captured on videotape. The video showed Jackson give Watson two packs of cigarettes and an object that appeared smooth and cylindrical.
¶ 10. Once Jackson left, Watson left the Intoxilyzer room. From there, Officer Thornton escorted Watson directly to Captain Rushing's custody. Watson showed Captain Rushing "a small bag that he had gotten from Mr. Jackson." According to Captain Rushing, the bag "was long and circular. It was kind of shaped like a pencil. It was long in length." Captain Rushing also noted that Watson was no longer in possession of the buy money. Captain Rushing gave the marijuana to Captain Chris Picou of the Lincoln County Sheriff's Department. Captain Picou placed the marijuana in a sealed evidence bag. Mississippi Crime Lab employee and forensic analyst, Chris Wise, confirmed that the bag contained 3.2 grams of marijuana.
¶ 11. Unaware of the events of June 3, Jackson returned to the Lincoln County jail the very next day. Jackson was arrested. When asked to empty his pockets, Jackson presented a series of dollar bills. Those bills were the "buy money" that Watson gave Jackson in exchange for marijuana. At trial, Watson stated, during cross-examination, "that money was for drugs."
¶ 12. Jackson executed a waiver of rights document and gave a voluntary statement. Jackson denied that he gave Watson marijuana, but he admitted that he brought cigarettes and a cell phone into the jail. When confronted with the existence of the videotape and asked about the other object that he gave Watson, Jackson responded that the tape was "inconclusive."

PROCEDURAL HISTORY
¶ 13. The Lincoln County Grand Jury returned an indictment against Jackson and alleged that Jackson violated Mississippi Code Annotated Section 47-5-198(1) (Rev.2004) when he sold marijuana in a correctional facility. On July 11, 2003, *661 Jackson executed a waiver of arraignment and pled not guilty.
¶ 14. On September 29, 2003, Jackson moved for a change of venue. The Lincoln County Circuit Court granted Jackson's motion and transferred venue to Amite County. Jackson went to trial before the Amite County Circuit Court from October 14-20, 2003. That trial ended with a mistrial when the jury was unable to agree on a verdict.
¶ 15. Jackson's second trial began on February 9, 2004. On the morning of trial, Jackson filed a second motion for change of venue. The circuit court reserved its decision until after voir dire. Following voir dire, the circuit court overruled Jackson's motion.
¶ 16. Following lunch on the 9th, the prosecution began to present its case. Over the course of the next three days, the prosecution called nine witnesses, including Officer Purser, Sheriff Boyte, Officer Thornton, Captain Rushing, Captain Picou, Cedric Washington, and experts on substance analysis and video enhancement. The prosecution also presented Watson's and Jackson's videotaped June 3 meeting.
¶ 17. Jackson began to present his case on February 11. Jackson presented eight witnesses over the next two days. Jackson took the stand in his own defense. As of February 12, Perkins had not appeared. Jackson requested a continuance, but the circuit court denied Jackson's request. Jackson then asked for permission to present Perkins's testimony from the first trial, but no one had a transcription of Perkins's prior testimony. The circuit court let Jackson proffer two defense investigators. They discussed the results of their interviews of Perkins. Jackson then rested.
¶ 18. The prosecution presented one rebuttal witness and then finally rested. As mentioned, the jury found Jackson guilty. On February 23, 2004, Jackson filed an unsuccessful motion for JNOV or, alternatively, for a new trial. Jackson appeals.

ANALYSIS
I. THE EVIDENCE IS INSUFFICIENT TO SUPPORT CONVICTION PURSUANT TO THE INDICTMENT AND RELEVANT LAW. THE LOWER COURT ERRED IN NOT GRANTING A JUDGMENT NOTWITHSTANDING THE VERDICT PURSUANT TO RULE 50(B) OF THE MISSISSIPPI RULES OF CIVIL PROCEDURE.
¶ 19. Jackson claims the circuit court erred when it overruled his motion for JNOV. As such, Jackson claims the evidence against him was insufficient to find him guilty. Gilbert v. State, 934 So.2d 330 (¶ 9) (Miss.Ct.App.2006) (rehearing denied July 25, 2006). We are mindful that, while reviewing challenges to the sufficiency of the evidence, we must consider the evidence in the light most consistent with the verdict. Jordan v. State, 936 So.2d 368 (¶ 24) (Miss.Ct.App.2005). In the context of an appeal of a criminal conviction, we give the State the benefit of all favorable inferences that may reasonably be drawn from the evidence. Id. If we conclude that reasonable jurors could not have found beyond a reasonable doubt that Jackson was guilty, then we must reverse Jackson's conviction. Id. Otherwise, we must affirm. Id.
¶ 20. Jackson submits that the evidence against him was insufficient to sustain a conviction because: (a) the prosecution's case was based entirely on circumstantial evidence, (b) the prosecution failed to prove that Watson was a reliable confidential informant, and (c) Watson's status as a prior convicted felon and Jackson's accomplice renders Watson's uncorroborated testimony *662 insufficient to support Jackson's conviction.

A. Circumstantial Evidence
¶ 21. Jackson first claims the prosecution relied entirely on circumstantial evidence. Jackson cites Murphy v. State, 566 So.2d 1201 (Miss.1990) and takes the position that, as his was a circumstantial evidence case, the prosecution failed to meet its burden of proof of guilt to the exclusion of every reasonable hypothesis consistent with innocence.
¶ 22. Jackson is mistaken. "[A] circumstantial evidence case is one in which there is no eye-witness and no confession." State v. McMurry, 906 So.2d 43 (¶ 13) (Miss.Ct.App.2004). Watson was an eyewitness. "[T]he presence of direct evidence means that the case sub judice is not a circumstantial evidence case." Id.

B. Watson's Reliability as a Confidential Informant
¶ 23. Here, Jackson notes that, in Pipkins v. State, 592 So.2d 947 (Miss. 1991), the Mississippi Supreme Court reversed a conviction because the prosecution failed to demonstrate that a confidential informant had previously provided reliable information. According to Jackson, "[l]ikewise in the instant case, the informants never been proven reliable." [sic].
¶ 24. It is in the context of the issuance of search warrants that a confidential informant must be proven reliable. See Lee v. State, 435 So.2d 674, 676-77 (Miss.1983). Watson did not supply information to obtain a search warrant and authorities never obtained a warrant based on Watson's information. Instead, Watson cooperated with authorities during the equivalent of a sting operation.

C. Sufficiency of Watson's Testimony
¶ 25. Jackson relies solely on Jones v. State, 368 So.2d 1265 (Miss.1979) for his proposition that Watson's testimony was insufficient to support his conviction. According to Jackson, "[i]n [Jones,] the court held that `evidence consisting entirely of the uncorroborated testimony of a convicted felon and confessed accomplice whose sentence had been deferred pending defendant's trial was insufficient to support the conviction.'"
¶ 26. Regardless of any language in Jones, Watson was not Jackson's accomplice when Jackson sold him marijuana during their attorney/client meeting in the Lincoln County jail. "An accomplice may be convicted of accomplice liability only for those crimes as to which he personally has the requisite mental state." Welch v. State, 566 So.2d 680, 684 (Miss.1990). Watson was working with Lincoln County law enforcement, so he could not have been an accomplice.
II. THE COURT SHOULD HAVE GRANTED THE MOTION FOR JUDICIAL RECUSAL.
¶ 27. Because Jackson had practiced law before them for a number of years, on August 22, 2003, Circuit Court Judges Keith Starrett and Mike Smith both recused themselves sua sponte. On August 29, 2003, Chief Justice Edwin Lloyd Pittman specially appointed Forrest Johnson to preside over Jackson's trial. In this issue, Jackson claims that Judge Johnson should have recused himself because of a fax he received during Jackson's first trial. Secondly, Jackson claims Judge Johnson exhibited a cumulative pattern of partiality towards the prosecution.

a. The Fax
¶ 28. Jackson's claim originates from a fax sent to Judge Johnson during Jackson's first trial in October of 2003. *663 According to Jackson, an unidentified attorney sent Judge Johnson a fax and claimed that Jackson's attorney, through his private investigator, attempted to bribe a police informant for $15,000 in exchange for perjured testimony. Jackson also states that the sending attorney represented an unidentified law enforcement officer whom Jackson terms "the primary investigating officer" in a separate civil matter. Finally, Jackson also notes that the sending party filed, against Jackson's attorney, a motion for sanctions pending in federal court as a result of a civil lawsuit that arose from Jackson's arrest.
¶ 29. "A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality." Jones v. State, 841 So.2d 115 (¶ 60) (Miss.2003). "The decision to recuse or not to recuse is one left to the sound discretion of the trial judge, so long as he applies the correct legal standards and is consistent in the application." Id. "On appeal, a trial judge is presumed to be qualified and unbiased and this presumption may only be overcome by evidence which produces a reasonable doubt about the validity of the presumption." Id. "In determining whether a judge should have recused himself, the reviewing court must consider the trial as a whole and examine every ruling to determine if those rulings were prejudicial to the complaining party." Id.
¶ 30. Based on his review of the allegations detailed in the fax, Judge Johnson stated:
[T]his has nothing to do with this trial in that this Court is not going to get into an investigation into any of these matters. This Court does not give any credence to . . . the claim that's made in this letter.
. . . .
What this Court is concerned with is the trial of this matter and that each side be allowed to present the evidence that is proper under the rules of court and the law and that the defendant receives a completely fair and impartial trial.
According to Jackson, Judge Johnson should have recused himself because "[t]he information in the letter, whether or not true, makes it impossible for the judge to maintain his impartiality before the jury."
¶ 31. The State submits that nothing in Judge Johnson's response gives rise to overcome the presumption of impartiality. We agree. Jackson only speculates that Judge Johnson could not have been impartial, but there is nothing among the record that suggests Judge Johnson was or could have been viewed as partial to the prosecution. Mere speculation is insufficient to raise reasonable doubt as to the validity of the presumption that the trial judge was qualified and unbiased. Farmer v. State, 770 So.2d 953 (¶ 13) (Miss.2000).

b. Cumulative Pattern of Impartiality
¶ 32. Additionally, Jackson lists a number of decisions in which Judge Johnson did not rule according to Jackson's position. The following is taken from Jackson's brief, verbatim:
[T]he Court refused to rule properly on certain Motions including suppression of a video tape, illegal substance.
The defense argued that the arrest was illegal and without probable cause. The defense further argued that the tapes contained hearsay information.
Motions in Limine as to admission of prior bad acts and any information related to prior bad acts, were denied by the court.
Motion in Limine regarding admissibility of the tape including hearsay information *664 on tape; the court denied such Motion.
The State employed an expert witness to testify as to the video tape. The Court allowed the expert testimony.
A request, by defendant, for continuance was based on discovery violation, failure to subpoena witness and failure to appear.
The State used peremptory challenges on black jurors in violation of the dictates of Batson v. Kentucky.

The jury verdict is not supported by sufficient evidence. A directed verdict should have been granted in the case. The Lower Court erred by not granting a directed verdict.
The jury verdict is not supported by sufficient evidence. A JNOV should hav [sic] been granted. The Lower Court erred by not granting a JNOV.
John Jackson applied for a change of venue on the specific grounds that the atmosphere in Amite County is prejudicial against the defendant as a result of the barrage of inflammatory articles appearing in the local newspaper.
The Court granted the State's expert witness without proper notice to the defense and in violation of the law relating to the expert witness.
The jury deliberated and returned a verdict of guilty. The judge sentenced Mr. Jackson to serve house arrest and to disbarment. The sentence of Mr. Jackson constitutes cruel and unusual punishment and is disproportionate under the Eighth Amendment to the United States Constitution.

Jackson then states, "[t]he above conclusion by the Court clearly suggest [sic] bias against John Jackson. The Court in this matter has shown bias against Mr. Jackson and his attorney."
¶ 33. We can only interpret these fragmented clusters of arguments as a claim that Judge Johnson exhibited a pattern of partiality towards the prosecution by way of his decisions. We address these individual issues elsewhere in this opinion and, as will be shown, we find no individual error. That is, Judge Johnson ruled properly at each instance listed as Jackson's rationale for a pattern of partiality for the prosecution. We certainly cannot find a pattern of bias in a series of correct decisions.
¶ 34. Otherwise, Jackson's claim is in stark contrast to the record. There are numerous instances in which Judge Johnson ruled in Jackson's favor. Nothing beyond speculation regarding Judge Johnson's individual decisions could suggest that Judge Johnson was partial to the prosecution. Jackson's argument under this heading is entirely without merit.
III. THE COURT SHOULD HAVE GRANTED THE MOTION FOR CHANGE OF VENUE.
¶ 35. Jackson claims the circuit court should have transferred venue from Amite County to some other unspecific county. The decision whether to grant a change of venue is in the discretion of the circuit court. We will not reverse a judgment of conviction on the ground that the circuit court refused to grant a motion for change of venue unless it is clear that the circuit court abused its discretion. Simon v. State, 688 So.2d 791, 804 (Miss. 1997). "The linchpin [of our consideration] is whether the venire members stated that they could be fair and impartial jurors if chosen." Id.
¶ 36. Jackson was indicted in Lincoln County. On September 29, 2003, Jackson filed a successful motion for a change of venue. Accordingly, the circuit court transferred venue to Amite County. On February 9, 2004, the first day of the second trial, Jackson filed another motion *665 to change venue to some county other than Amite County. The circuit court deferred ruling on Jackson's motion until the completion of voir dire. After voir dire, the circuit court ruled as follows:
The Court has found from voir dire that, I believe, there were 72 jurors that were qualified this morning. Out of those 72, only 13 of the jurors stated that they knew something or had heard something about the case. Those numbers of those jurors are in the record. On questioning by counsel for the defendant, there is some discrepancy, in that by my count there were 14 jurors who stated they had actually read an article about the trial. So there is a slight variance in the ones that are on the Court's voir dire that mentioned that they knew something about he [sic]13.
Of those 13, two of the jurors have been excused, although not for reasons of pretrial publicity. Considering the numbers involved, the Court finds there is no widespread evidence of any pretrial or prejudice against the defendant due to pretrial publicity. Specifically, there is very little knowledge of this case at all by the jury panel.
So given those numbers, the Court finds that notwithstanding the motion and the affidavits attached, there is simply no evidence of any widespread prejudicial pretrial publicity or even knowledge of this case.
¶ 37. According to Jackson, a change of venue was warranted due to (a) "a great deal of highly prejudicial and pervasive publicity" and (b) "the dissemination of extremely prejudicial material in the surrounding counties."
¶ 38. The impaneled jury members all stated that they would serve as fair and impartial jurors. Additionally, the circuit court clearly stated that, of the relatively few members of the venire who had read an article about the case, none of those veniremen actually sat on the jury. Accordingly, we affirm the circuit court's decision.
IV. THE LOWER COURT ERRED IN NOT DISQUALIFYING THE DISTRICT ATTORNEY: (a) MISCONDUCT AS RELATED TO WITNESS TAMPERING, (b) DISCOVERY VIOLATION, (c) BIAS OF THE DISTRICT ATTORNEY'S GENERAL OFFICE, (d) VIOLATION OF BATSON RULE.
¶ 39. In this issue, Jackson raises a barrage of complaints centered around a broad allegation of prosecutorial misconduct. In particular, Jackson alleges that the district attorney's office engaged in (a) witness tampering, (b) discovery violations, and (c) a pattern of bias against Jackson.
¶ 40. Jackson also lists an issue simply titled "Prior Bad Act." Jackson raises this precise question in issue twelve. Accordingly, we will discuss that issue there, rather than here. As will be shown, we find no error in the circuit court's admission of what Jackson terms "prior bad acts."
¶ 41. Similarly, Jackson also claims that the prosecutor engaged in Batson violations. Again, Jackson raises a Batson question in issue ten. Again, we will discuss that issue there. However, it bears mentioning that we find no error in issue ten, so we will certainly not find prosecutorial misconduct as a result.
¶ 42. Before we delve into Jackson's myriad of prosecutorial misconduct allegations, we note that Jackson does not cite to the record once among his litany of complaints under this issue. As the State points out, the record before us contains a 991 page transcript and 570 pages of court papers. According to the State, Jackson's failure to cite to relevant portions of the *666 record "is like tossing a quarter into the sea and telling the reader to dive for it." We agree. Jackson was obligated to point to specific factual issues supporting his claim for relief accompanied by citations to the record showing where the evidence relating to the issues may be found. Moody v. State, 838 So.2d 324 (¶ 57) (Miss. Ct.App.2002). Jackson utterly and entirely failed to cite to the record. Notwithstanding Jackson's complete failure to cite to the record, we will consider Jackson's claims for the sake of argument.

a. Witness Tampering
¶ 43. Jackson claims the district attorney threatened to prosecute Herbert Perkins, one of Jackson's witnesses, for perjury. During Jackson's first trial, Perkins testified that Watson set up Jackson. Jackson also notes that Perkins did not appear for Jackson's second trial, though Jackson subpoenaed Perkins. According to Jackson, "Mr. Smith and the district attorney's actions amount to witness tampering, an [sic] violation of criminal law, and John Jackson's right to a fair trial."
¶ 44. There is absolutely no evidence whatsoever to support Jackson's claim that the prosecution threatened to prosecute Perkins for perjury or that Perkins failed to appear under the threat of prosecution. The prosecution speculated that Perkins may not have appeared out of fear of perjuring himself, but the prosecution clearly stated that it was speculating. "Issues cannot be decided based on assertions from the briefs alone. The issues must be supported and proved by the record." King v. State, 857 So.2d 702 (¶ 12) (Miss.Ct.App.2003). As such, this baseless allegation is meritless.

b. Discovery Violations
¶ 45. Jackson's entire argument for the proposition that the district attorney's office engaged in discovery violations is the following sentence: "That several days prior to trial the district attorney submitted additional expert witness [sic], photographs and other items related to the examination of the video tape, thus a discovery violation."
¶ 46. Besides his complete failure to cite to the record, this issue is barred for a separate reason. At trial, Jackson's attorney admitted that he did not make an issue of the timeliness of the prosecution's discovery. That is, Jackson failed to object at trial. Where a party fails to make a contemporaneous objection, the procedural bar operates and the error, if any, is waived. Seeling v. State, 844 So.2d 439 (¶ 23) (Miss.2003). As such, this issue is, again, procedurally barred.

c. Bias
¶ 47. Jackson again submits a very brief argument for the concept that the district attorney should have been disqualified due to overt bias against Jackson. Jackson's argument is as follows:
The conflict between Assistant Prosecutor, Danny Smith, and John Jackson continues. John Jackson's aggressive style as a local attorney has caused Danny Smith to express an angry demeanor towards John Jackson. Additionally, John Jackson filed a civil complaint against Danny Smith and the District Attorney's Office.
¶ 48. Jackson cites no authority for the concept that a prosecutor must be unbiased towards a criminal defendant. Failure to cite relevant authority causes the procedural bar to operate. King, 857 So.2d at (¶ 70). Additionally, Jackson merely advances allegations based on speculation. There is no evidence among the voluminous record that any member of the *667 district attorney's office acted under the color of bias in prosecuting Jackson.
V. THE COURT ERRED NOT [SIC] GRANTING A DISMISSAL BASED ON JURY MISCONDUCT AND FAILURE TO RELEASE THE JURY AT A REASONABLE TIME.
¶ 49. Having alleged prosecutorial misconduct and misconduct on the part of the trial judge in not recusing, Jackson now alleges jury misconduct. According to Jackson, "several members of the jury started deliberations prior to presentation of the defense's case." Jackson also adds, "the jurors were tired and ready to go home due to the lateness of the hour, and that they were fed late."
¶ 50. "A criminal defendant is guaranteed the right to a trial by an impartial jury." Seeling v. State, 844 So.2d 439 (¶ 28) (Miss.2003). Jurors are prohibited from discussing a case among themselves "until all the evidence has been presented, counsel have made final arguments, and the case has been submitted to them after final instructions by the trial court." Id. If the jury should discuss the case among themselves before the matter is submitted to them for resolution, reversible error will result "in almost every instance." Id.
¶ 51. In distinguishing Holland v. State, 587 So.2d 848 (Miss.1991) the Seeling court discussed White v. State, 742 So.2d 1126 (Miss.1999). Seeling, 844 So.2d at (¶ 29). Seeling found that, unlike Holland, "the jury in White never gave the court an indication it had considered the guilt or innocence of the defendant before retiring to deliberate." Id. In White, an alternate juror submitted an affidavit and "indicated the jury was predetermined to find White not guilty, rather than convict him." Id. The Seeling court noted that, in White, "[t]he trial judge, on several occasions, instructed the jury not to discuss the case with anyone else or among themselves." Id. The trial judge in White also "instructed the jury to decide the case based on the evidence presented at trial." Finally, the defendant in White failed to demonstrate how he was denied a fair trial. Id.
¶ 52. Again, Jackson has utterly failed to direct this Court to the portion of the record he references. As such, this issue is procedurally barred. Moody, 838 So.2d at (¶ 57). We have pored over the record and found only one instance properly before this Court in which Jackson alleged any potential jury misconduct. The record shows that the alleged offending "juror" did not sit on the jury. What is more, as in White, Jackson does not even attempt to demonstrate just how he was prejudiced. It appears that he speculates that the jurors agreed on a guilty verdict based on the time at which they were fed. Jackson's argument is no more than rank speculation. By the same logic, the jurors could have just as easily agreed to find Jackson not guilty. In any event, there is no evidence among the record that the jury's verdict resulted from their being fed late. We find no merit to this issue.
¶ 53. As mentioned, we found only one instance of jury misconduct that is properly before this Court. There is another allegation of jury misconduct that is not before us. On February 23, 2004, Jackson filed a motion for JNOV or, alternatively, for new trial. Within that motion, Jackson argued jury misconduct. The circuit court conducted a hearing on Jackson's motion on June 7, 2004. The circuit court's June 10, 2004 order reflects that, at that hearing, "[c]ounsel for Jackson stated that one of [the] jurors had told him of certain information about some of the jurors already deciding the case. Counsel never stated the juror's name, but requested that he be allowed to attempt to obtain an *668 affidavit later." Later, the circuit court stated that Jackson, "had no other evidence to present other than counsel's statement of what a juror had allegedly told him." Accordingly, the circuit court declined to grant any relief on the basis of that allegation.
¶ 54. On July 9, 2004, Jackson filed his notice of appeal. On July 30, 2004, Jackson filed his designation of the record. Then, on August 20, 2004, Jackson filed a motion to amend the record to include an affidavit from Peachie Cowart, one of the alternate jurors in Jackson's trial. According to Cowart's affidavit:
We [the jury] were instructed by the judge not to discuss this case until both sides had concluded the presentation of their case. However, the white jurors had decided that John Jackson was guilty prior to the completion of the case.
[T]he white jurors discussed John Jackson's guilt among themselves each time we took a break. And each time, they discussed the case among themselves they concluded that John Jackson was guilty.
When the jury would be asked to go into the jury room. [sic] The black jurors said they would not go against John Jackson, and the white jurors were against John Jackson. The white jurors kept saying, "he did it." Especially, when they looked at the video.
Cowart's affidavit was signed, sworn, and dated as of June 25, 2004.
¶ 55. There is a fundamental problem with the timing of Cowart's affidavit. During the hearing on Jackson's post-trial motions, Jackson never put Cowart's affidavit before the circuit court. Instead, Jackson raised broad and nonspecific allegations. Later, Jackson inserted Cowart's affidavit into the record, but not before he filed his notice of appeal. The circuit court never had an opportunity to pass on the specific allegations in Cowart's affidavit. We will not find error unless the circuit court first had an opportunity to review a question. King, 857 So.2d at (¶ 40). Accordingly, this precise issue is procedurally barred.
VI. THE LOWER COURT ERRED BY ALLOWING THE VIDEO TAPE AND ILLEGAL SUBSTANCE AS EVIDENCE.
¶ 56. Here, Jackson claims that the circuit court should have excluded any evidence that stemmed from Officer Purser's "investigation." Characterizing Officer Purser's actions as an "investigation" is somewhat of a stretch. In actuality, Officer Purser received information that Watson had marijuana in the jail and then turned that information over to Sheriff Boyte. In any event, Jackson claims that Officer Purser exceeded the scope of his authority as a Correctional Field Officer.
¶ 57. We review a circuit court's decision regarding the admission of evidence for abuses of discretion. Burton v. State, 875 So.2d 1120 (¶ 6) (Miss.Ct.App.2004). In other words, we will not disturb a circuit court's decision unless it is clearly wrong. Id. We will only find an abuse of discretion if a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense. Id.
¶ 58. Jackson advances a curious rationale for his assertion that neither the videotape nor the actual substance was admissible as evidence. According to Jackson, Purser, a corrections officer, exceeded the scope of his authority in conducting an investigation of a matter unrelated to supervision of probationers or parolees under the jurisdiction of the MDOC. Accordingly, Jackson claims that the investigation of Jackson was illegal *669 and, by extension, Jackson's arrest was illegal. Jackson reasons that any evidence collected as a result of his illegal arrest should have been excluded as "fruit of the poisonous tree."
¶ 59. Jackson does not submit authority for the proposition that a probation officer, upon learning that an inmate possesses contraband, is prohibited from passing that information on to other authorities. This Court will not review any issues in which a party fails to cite relevant authority. King, 857 So.2d at (¶ 70).
¶ 60. In an entirely separate argument, yet still under the same heading, Jackson claims that the "[e]vidence should be suppressed based on the lack of reliability of the confidential informant, Cedric Washington. [sic]" Jackson reasons that "[n]o evidence has been offered indicating that this particular CI had ever provided information to the officers in the past. Nor way [sic] any evidence offered showing that the CIA [sic] was truthful or reliable."
¶ 61. Jackson claims the circuit court should have suppressed the evidence that resulted from his arrest. In issue one, Jackson claimed the evidence was insufficient to convict him because Watson was not shown to be a reliable confidential informant. We found that Watson was not a confidential informant in the context that authorities relied on his word as the basis for a search or arrest warrant. There is no reason to revisit that issue here. Suffice it to say, we find no basis to exclude evidence under the rationale that Watson was not a reliable confidential informant because it was not necessary to do so where Watson did not supply information to obtain any type of warrant.
VII. THE COURT ERRED IN NOT GRANTING A DISMISSAL OR CONTINUANCE FOR WITNESS FAILURE TO APPEAR.
¶ 62. Jackson submits the following argument, taken verbatim from his brief:
Whether a new trial should have been granted based on the lower court failure to grant a continuance for failure of witness to appear, allowing violation of witness and subpoena.
That the defense attorney requested several continuances based on discovery violation, failure to appear of subpoena of witness not served. The lower court denied said request for continuance. The defense was at a disadvantage.
¶ 63. Jackson then cites the following language from Morris v. State, 927 So.2d 744 (¶ 8) (Miss.2006):
In criminal cases which have issues pertaining to the exclusion of evidence or witnesses due to discovery violations, we look to Mississippi Rule of Uniform Circuit and County Court Practice 9.04(I), which provides that, if, prior to trial, the circuit court is made aware of one party's failure to comply with an applicable discovery rule, it has the discretion to allow such evidence to be presented at trial, to grant a continuance, or to enter such an order as it deems just under the circumstances. If the circuit court determines that the defendant's newly-discovered evidence or witnesses are prejudicial to the State, the State must ask for a continuance so that it may review the evidence or interview the witnesses and thus become prepared to counter the same. Even if the State does not ask for a continuance, the circuit court cannot exclude the evidence. [citation omitted]. To do so would be to violate the Compulsory Process Clause.
¶ 64. It appears that Jackson claims the circuit court should have granted a continuance when his witness, Herbert Perkins, failed to appear as subpoenaed. The Compulsory Process Clause *670 gives a criminal defendant "the right to compel the presence and present the testimony of witnesses." Taylor v. Illinois, 484 U.S. 400, 409, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). However, "[t]he decision to grant or deny a continuance is one left to the sound discretion of the trial court." Johnson v. State, 631 So.2d 185, 189 (Miss.1994). "Unless manifest injustice appears to have resulted from the denial of the continuance, this Court should not reverse." Id.
¶ 65. Where a party requests a continuance, the following procedure applies:
On all applications for a continuance the party shall set forth in his affidavit the facts which he expects to prove by his absent witness or documents that the court may judge of the materiality of such facts, the name and residence of the absent witness, that he has used due diligence to procure the absent documents, or presence of the absent witness, as the case may be, stating in what such diligence consists, and that the continuance is not sought for delay only, but that justice may be done. The court may grant or deny a continuance, in its discretion, and may of its own motion cross-examine the party making the affidavit. The attorneys for the other side may also cross-examine and may introduce evidence of affidavit or otherwise for the purpose of showing to the court that a continuance should be denied. No application for a continuance shall be considered in the absence of the party making the affidavit, unless his absence be accounted for to the satisfaction of the court. A denial of the continuance shall not be ground for reversal unless the supreme court shall be satisfied that injustice resulted therefrom.
Miss.Code Ann. § 99-15-29 (Rev.2000).
¶ 66. The record shows that Perkins was personally served with a subpoena on February 6, 2004. Perkins did not appear. Jackson first realized that Perkins may not appear after lunch on February 9, the first day of trial. Jackson never indicated that he was not ready to proceed with trial. When Jackson first mentioned any difficulty in having Perkins appear, no return for service of process was present in the record before the circuit court. The circuit court asked Jackson and the court clerk for a return. The court clerk was finally able to get a copy of the return after lunch on February 11, the third day of trial. As soon as the circuit court was assured that Perkins had been served, the circuit court issued a bench warrant for Perkins's arrest. However, authorities were still unable to locate Perkins.
¶ 67. Jackson requested a continuance, but the circuit court denied Jackson's request. Jackson's attorney claimed that he constantly tried to locate Perkins. The prosecution did not deny that. Rather, the prosecution stipulated that Jackson made an effort to find Perkins. Jackson never requested a continuance for any other purpose but to secure Perkins's attendance at trial, but Perkins could not be located. Jackson did not request a continuance to secure a transcript or an audiotape of Perkins's prior testimony, despite the circuit court's repeated prompting. The circuit court twice asked both parties whether anyone had a transcript of Perkins's prior testimony. Each party answered, "no." When asked whether Jackson made any attempts to get a transcript, Jackson's attorney mentioned that, "some time ago," he contacted the court reporter and inquired as to the costs of getting a transcript. Jackson's attorney did not specify as to when a transcript might be available. He certainly did not mention that he had requested a copy of the transcript and, most significantly, he did not request a continuance for that purpose.
*671 ¶ 68. Where a circuit court denied a defendant's motion for a continuance based on the absence of a witness who would have testified favorably for the defendant, the circuit court did not abuse its discretion because the defendant did not indicate the whereabouts of the witness or show that the witness would likely be available at some time in the future. Parham v. State, 229 So.2d 582, 584 (Miss.1969) (citing Ellis v. State, 198 Miss. 804, 23 So.2d 688 (1945)). The record contains no affidavits or any other indication that anyone knew Perkins's whereabouts and there was no indication that Perkins would likely be available at some time in the future. As of March of 2004, authorities were still unable to locate Perkins. Given the circuit court's discretion under our standard of review and the precedent established by Parham, we can find no error.
VIII. THE COURT ERRED IN ITS DENIAL OF CERTAIN JURY INSTRUCTIONS.
¶ 69. In this issue, Jackson complains that the circuit court improperly declined to instruct the jury per three of his proposed jury instructions. To be exact, Jackson states, "The Court wrongfully denied defense jury instructions which were tantamount to a violation of John Jackson's constitutional rights." Jackson then quotes each of the following instructions, and finally, argues, "[t]he above jury instructions were denied by the Court and therefore constitutes judicial error."
¶ 70. Assuming, for the sake of argument, that Jackson fulfilled his obligation to submit a properly briefed argument, when an appellant claims that the circuit court erred when it refused to grant a requested instruction, we do not consider the requested instruction in isolation. Smith v. State, 907 So.2d 292 (¶ 13) (Miss. 2005). Instead, we consider all the jury instructions as a whole. Id. The circuit court may refuse to give a requested instruction that incorrectly states the law, that is covered elsewhere in the instructions, or is without foundation in the evidence. Id.

a. Proposed Instruction D-1
¶ 71. Through his proposed instruction D-1, Jackson requested that the circuit court instruct the jury to weigh Watson's testimony as Jackson's accomplice. That is, Jackson requested that the jury weigh Watson's testimony "with great care, caution, and suspicion." The circuit court found the instruction improper due to a lack of accomplice testimony. Jackson argued that the instruction was appropriate because "Watson actually testified and some of the other witnesses sort of alluded to the fact that Mr. Jackson had been bringing drugs to Cedric Watson." The circuit court stated that the instruction was improper because "this [was] a situation where it was allegedly a controlled delivery or transfer in a jail facility where [Watson] was fully working and cooperative for the state." Jackson now claims the circuit court erred when it refused to grant his instruction as requested.
¶ 72. We find that the circuit court was correct when it refused instruction D-1. There was no evidence that Watson was Jackson's accomplice at the time Jackson was videotaped transferring marijuana to Watson. At that time, Watson cooperated in the authorities' investigation of Jackson. "An accomplice may be convicted of accomplice liability only for those crimes as to which he personally has the requisite mental state." Welch, 566 So.2d at 684. That is, an accomplice must have a "community of intent" in the commission of the crime at issue. Id. Since Watson was not an accomplice, the circuit court correctly refused the instruction. Smith, 907 So.2d at (¶ 13).

*672 b. Proposed Instruction D-15
¶ 73. Jackson requested a circumstantial evidence instruction. Jackson's proposed instruction D-15 stated, "[t]he Court instructs the jury that in a circumstantial evidence case that the State is required to prove the accused's guilt not only beyond a reasonable doubt, but to the exclusion of every other hypothesis consistent with innocence." The circuit court refused the instruction because "[t]here has been direct evidence by way of the testimony of [Watson]." Jackson claimed the circuit court erred.
¶ 74. A circumstantial evidence instruction is only proper if the case against the defendant is entirely comprised of circumstantial evidence. Sheffield v. State, 749 So.2d 123 (¶ 12) (Miss.1999). If there is some type of direct evidence, such as eyewitness testimony, the circuit court should not give a circumstantial evidence instruction. Id. The State presented direct evidence in the form of Watson's testimony. Accordingly, the circuit court did not err when it denied proposed instruction D-15.

c. Proposed Instruction D-24
¶ 75. D-24 stated:
The testimony of an alleged accomplice, and the testimony of one who provides evidence against a defendant as an informer for pay or for immunity from punishment or for personal advantage or vindication, must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. You, the jury, must decide whether the witness's testimony has been affected by any of those circumstances, or by the witness's interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness has received either financially or as a result of being immunized from prosecution. You should keep in mind that such testimony is always to be received with caution and weighed with great care.
You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.
The circuit court refused D-24 because "it [was] not proper on the evidence in this case. And also this has been covered adequately by our other instructions on witnesses in this case. And the jury can consider any possible motives they may have for their testimony." Jackson claims the circuit court erred when it refused to grant D-24. We disagree.
¶ 76. First and foremost, we have already found that Watson was not Jackson's accomplice at the time Jackson was videotaped passing marijuana to Watson. Second, this instruction appears to be an instruction on bias. In effect, the circuit court instructed the jury to consider possible bias in weighing testimony. Instruction C-1 instructed the jury that it was not to be "influenced by bias." Instruction D-14 stated that the jury "must consider . . . how the witness might be affected by the verdict." Because this instruction contains a misstatement of law and is covered elsewhere in other instructions, we find no error in the circuit court's decision to refuse D-24. Smith, 907 So.2d at (¶ 13).
IX. THE COURT ERRED IN ALLOWING TESTIMONY OF EXPERT ON VIDEO TAPE.
¶ 77. In this issue, Jackson appears to raise two separate claims regarding the testimony of Lindsey Thornhill, the prosecution's expert witness on surveillance video enhancement. First, Jackson submits that the prosecution failed to timely list Thornhill in discovery. Second, Jackson seems to argue that the prosecution elicited *673 impermissible testimony from Thornhill. Specifically, Jackson argues, "the testimony of the expert was an attempt to explained [sic] the actions of the persons on the video tape, not any expert knowledge." Since Jackson submits two entirely separate arguments, we will address them each in turn.

A. Discovery
¶ 78. Jackson's entire argument for a discovery violation is as follows: "Several days prior to trial the District Attorney's office produced information of a video-taped discussion between John Jackson and Cedric Watson. The District Attorney violated Discovery Rule 9.04 by not providing the expert testimony in a timely manner."
¶ 79. Yet again, Jackson does not cite to the record to direct this Court as to where he objected to either the videotape or Thornhill's testimony on the basis of untimely discovery. Additionally, Jackson did not raise this issue in his motion for JNOV. What is more, Jackson's attorney admitted that he "did not make an issue of" whether the prosecution timely submitted Thornhill in discovery. Where a party fails to make a contemporaneous objection, the procedural bar operates and the error, if any, is waived. Seeling, 844 So.2d at (¶ 23). Accordingly, this issue is procedurally barred.

B. Scope of Thornhill's Testimony
¶ 80. Jackson apparently argues that Thornhill's testimony exceeded the scope of M.R.E. 702. The decision whether a witness is qualified as an expert in fields of scientific knowledge is one left to the discretion of the circuit court. Cowart v. State, 910 So.2d 726 (¶ 11) (Miss. Ct.App.2005). We will only reverse the circuit court if the decision was clearly erroneous. Id. That is, we will not reverse the circuit court's decision unless it is clear that the witness was not qualified. Id. Additionally, an expert's testimony is always subject to M.R.E. 702. To give a M.R.E. 702 opinion, a witness must have "experience or expertise beyond that of an average adult." Id.
¶ 81. Jackson does not make it clear as to which portion of Thornhill's testimony he finds improper. As mentioned, he only claims "the testimony of the expert [presumably Thornhill, though Jackson does not specify] was an attempt to explained [sic] the actions of the persons on the video tape, not any expert knowledge." Having read Thornhill's entire testimony, at no point did Jackson object to Thornhill's testimony on the basis that it was beyond the scope of her expertise or that it was improper opinion testimony. We will not address an issue unless the circuit court has first had an opportunity to "pass on the question." Seeling, 844 So.2d at (¶ 18). Said differently, where a party fails to make a contemporaneous objection, the procedural bar operates and the error, if any, is waived. Id. at (¶ 23). Accordingly, this issue is barred due to a lack of a contemporaneous objection.
¶ 82. Lack of contemporaneous objection notwithstanding, there is no merit to Jackson's claim. The State correctly notes that Thornhill did not opine as to whether the passed item was marijuana. Thornhill never attempted to explain either Jackson's or Watson's actions on the videotape. Thornhill testified that she enhanced the video and that, in her expert opinion, Jackson passed Watson an object that was round or curved. During cross-examination, Thornhill elaborated and testified, "[t]he best example for me to give would be the bottom of a test tube, maybe. Just kind of a rounded curve shaped bottom, a cup shape, not necessarily round as in ball round, but just a curve." Thornhill also testified that the object did not have a *674 sharp or squared edge. As such, this issue is meritless.
X. THE BATSON RULE WAS VIOLATED AND THUS THE COURT ERRED IN ITS FAILURE TO FOLLOW THE LAW AS IT RELATES TO JURY SELECTION.
¶ 83. Jackson claims that the circuit court erred when it overruled his Batson objection. Though Jackson does not specify as to which potential juror or jurors the circuit court allegedly erred when it accepted race-neutral explanations, we will address them each.
¶ 84. We must give great deference to the circuit court's determinations under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), because such determinations are largely based on credibility. Gibson v. State, 731 So.2d 1087 (¶ 23) (Miss.1998). In the context of Batson, "great deference" means we will not reverse the circuit court unless its decision is clearly erroneous. Id.
¶ 85. A party objecting to the use of peremptory challenges under Batson must make a prima facie case showing that the opposing party exercised its peremptory challenges on the basis of race. Id. at (¶ 24). To present that prima facie case, the challenging party must demonstrate: (1) that he is a member of a "cognizable racial group;" (2) that the challenging party exercised peremptory challenges towards the elimination of veniremen of his race; and (3) that facts and circumstances raised an inference that the challenging party used his peremptory challenges for the purpose of striking minorities from the venire. Id. If the objecting party presents a prima facie case under Batson, the burden shifts to the challenging party, who may rebut that prima facie case by a demonstration of race-neutral reasons for his exercise of peremptory challenges. Id. If the challenging party offers a race-neutral explanation, the objecting party may rebut the explanation. Id.
¶ 86. Jackson claims the prosecution used all of its peremptory challenges on black jurors. That is not correct. At the time Jackson made his Batson objection, the prosecution had used four of its six peremptory challenges. Of those four peremptory challenges, the prosecution exercised two peremptory challenges against black females, one against a black male, and one against a white female. Additionally, the prosecution accepted one black male.
¶ 87. Jackson's misstatement notwithstanding, the circuit court found that Jackson was a member of a cognizable racial group, that the prosecution exercised three of its four peremptory challenges against members of Jackson's racial group, and that the prosecution would be required to give race-neutral reasons for the exercise of its peremptory challenges.
¶ 88. The prosecution exercised a peremptory instruction against Juror Number 11, a black male. The prosecution explained that it exercised that peremptory challenge because his brother had been arrested and indicted on a drug charge and his case was pending at the time of Jackson's trial. The circuit court accepted the prosecution's explanation as race-neutral. Where a juror is related to someone currently involved in a criminal proceeding, that is a sufficient race-neutral reason to exercise a peremptory challenge. Avant v. State, 896 So.2d 379 (¶ 14) (Miss.Ct.App.2005). Accordingly, we will not disturb the circuit court's decision.
¶ 89. The prosecution exercised its third peremptory challenge against a black female. The prosecution *675 explained that it exercised its challenge because that potential juror's son had been convicted for a drug offense. The prosecution also explained that she was "unfriendly" towards the prosecution when it asked her about her son's case. The circuit court accepted the prosecution's explanation as race-neutral. A juror whose brother was convicted of armed robbery can easily be seen as being potentially prejudiced against the prosecution. Lockett v. State, 517 So.2d 1346, 1351 (Miss. 1987). Likewise, a juror whose son had been previously convicted for a drug offense could potentially be prejudiced against the prosecution. Not only that, where a potential juror displays an unfriendly attitude towards the prosecution, that is a sufficient race-neutral reason to exercise a peremptory strike. Id. As such, we find no abuse of discretion by the circuit court.
¶ 90. The prosecution exercised its fourth peremptory challenge against a black female. The prosecution explained that it exercised S-4 because that potential juror had previously sat on a jury that found the defendant in that particular case not guilty. The circuit court accepted the prosecution's explanation as race-neutral. Given our standard of review, we can find no abuse of discretion in this decision.
¶ 91. After Jackson exercised his peremptory challenges, the prosecution accepted two black jurors and one white juror before it exercised its fifth peremptory challenge against a black female. Accordingly, the circuit court asked the prosecution whether it had a race-neutral reason for its peremptory challenge. The prosecution explained that it exercised a peremptory challenge on that particular member of the venire because her brother and her cousin were both in prison for drug-related convictions.
¶ 92. A juror whose brother had been convicted of a crime can easily be seen as being potentially prejudiced against the prosecution. Lockett, 517 So.2d at 1351. Jackson does not claim that the circuit court's decision to accept that explanation as race-neutral was clearly erroneous. Even if he had, pursuant to our deferential standard of review, we would still find that the circuit court did not err.
¶ 93. Finally, the prosecution exercised its sixth peremptory challenge against a black female. Again, the circuit court asked for the prosecution's reasoning. The prosecution explained that it exercised a peremptory challenge against that potential juror because she had been convicted for DUI and was, at that time, on probation. This Court has upheld peremptory strikes based on the conviction of the prospective juror for DUI. Berry v. State, 802 So.2d 1033 (¶ 24) (Miss.2001).
¶ 94. As for the alternate jurors, the prosecution accepted one black female and then challenged another black female. The prosecution explained that it was challenging that alternate because she was related to Jackson's attorney. Jackson's attorney claimed he had never met the potential alternate juror. The circuit court accepted the prosecution's rationale as race-neutral. It certainly seems reasonable that the prosecution would not want an alternate juror to serve where that alternate could be influenced by a familial relationship with the defendant's attorney. The potential juror was certainly aware of her relationship to Jackson's attorney. Accordingly, we can find no abuse of discretion.
XI. THE DESTRUCTION OF THE PRIOR VIDEO TAPES WERE [SIC] IN BAD FAITH.
¶ 95. Lincoln County authorities recorded meetings between Jackson and *676 Watson in which Jackson did not pass Watson marijuana. The Lincoln County authorities did not preserve the videotapes of those meetings. At trial, Jackson objected to the destruction of those videotapes that he considered exculpatory. The circuit court overruled Jackson's objection. Jackson claims the circuit court erred.
¶ 96. Jackson cites State v. McGrone, 798 So.2d 519 (Miss.2001) as his authority. In McGrone, the supreme court stated:
[T]o find a due process violation by the State in a preservation of evidence case: (1) the evidence in question must possess an exculpatory value that was apparent before the evidence was destroyed; (2) the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means; and (3) the prosecution's destruction of the evidence must have been in bad faith.
Id. at (¶ 11).
¶ 97. The first factor under the three-step analysis discussed in McGrone is whether the evidence possesses "an exculpatory value that was apparent before" the Lincoln County Sheriff's Department destroyed the tapes. Id. Jackson claims that the videotapes were exculpatory in that they "could have provided information to the jury that would prove [Watson] lied and that his testimony was not corroborated by previous video tapes." Jackson's reasoning is dubious, at best. According to Jackson's logic, because the videotapes at issue did not reflect that he passed Watson marijuana during meetings that did not take place on June 3rd, those tapes were evidence in contrast to Watson's testimony. That is not correct. For Jackson's reasoning to apply, Watson would have had to testify that Jackson brought him marijuana on the occasions that would have been memorialized on videotapes that were later destroyed. Instead, Watson testified that Jackson brought him marijuana during the meeting that was preserved on the videotape submitted into evidence. In effect, Jackson argues that, because the unpreserved tapes did not show him passing marijuana to Watson on separate dates, he did not pass marijuana to Watson on June 3rd. That is not necessarily exculpatory evidence. It is evidence of inconsistent behavior on a separate occasion, but it is not directly contradictory to the evidence of his guilt.
¶ 98. Even if we were to find that the unpreserved tapes contained exculpatory evidence, which we do not find, Jackson could not satisfy the second factor under the McGrone analysis. That is, "the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." McGrone, 798 So.2d at (¶ 11). Jackson presented testimony from multiple witnesses who all testified that the videotapes at issue contained no evidence of Jackson passing marijuana to Watson.
¶ 99. Having utterly failed to prove the first two factors under the McGrone analysis, Jackson likewise fails to prove the third. The final factor under McGrone is a demonstration that "the prosecution's destruction of the evidence must have been in bad faith." Id. "Where the State's actions absolutely prevent a defendant in a criminal case from presenting proof on this issue, we will consider the requirement of bad faith to have been proven." Id. at (¶ 13). By failing to preserve evidence that was neither dispositive of innocence nor of guilt as to the date Jackson actually passed marijuana to Watson, the prosecution did not prevent Jackson from presenting proof on *677 whether he was guilty on the date in question. The State only need save evidence that would be of value or "play a significant role" in a case. Jackson v. State, 766 So.2d 795 (¶ 10) (Miss.Ct.App.2000). Destruction of evidence must be intentional and must indicate an attempt at fraudulently concealing evidence. Id. There is no indication that the prosecution destroyed the tapes to conceal evidence. Accordingly we find absolutely no merit to this issue.
XII. THE LOWER COURT ERRED BY NOT DISMISSING THE INDICTMENT OR GRANTING A MISTRIAL WHEN IT ALLOWED TESTIMONY OF PRIOR BAD ACTS OF THE ACCUSED.
¶ 100. In his twelfth issue, Jackson claims that the jury heard inadmissible "prior bad acts." To be precise, Jackson claims, "the District Attorney presented to the jury evidence of prior acts presenting to the jury that it was a crime for John Jackson to bring cigarettes and cell phones in the jail. Danny Smith [sic] [the prosecutor] actions was intentional and designed to mislead the jury." Jackson goes on to state, "[t]he misconduct of the District Attorney by eliciting testimony from Officer [sic] regarded [sic] alleged prior bad acts of Mr. Jackson violated Rule 404(b) of the Mississippi Rules of Evidence."
¶ 101. Jackson's argument seems somewhat inconsistent with the theory of his defense. That is, Jackson claimed that he did not bring marijuana into the jail. He submitted that he brought cigarettes into the jail and that the video captured him giving Watson a crushed pack of cigarettes instead of marijuana. It is surprising that Jackson claims those act were "prior bad acts" when he specifically argued that behavior as his defense. In any event, we have already discussed the appropriate standard of review regarding the admission of evidence. For brevity's sake, if brevity is still possible, we do not repeat our standard of review here.
¶ 102. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." M.R.E. 404(b). "It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id.
¶ 103. Yet again, Jackson does not relate his argument under this heading to any particular portion of the record. However, we can discern the points in the record from which Jackson's complaints originate. Jackson claims the prosecutor improperly "present[ed] to the jury that it was a crime for [Jackson] to bring cigarettes and cell phones in the jail." Our review of the voluminous record reveals that this complaint could only stem from a comment made during the prosecution's opening statement.
¶ 104. During the prosecution's opening statement, the prosecutor stated, "Attorneys are not allowed to bring cigarettes directly to prisoners either or cell phones, nothing like that." At that point, Jackson's attorney asked to approach the bench. The circuit court excused the jury and then allowed Jackson's attorney to make his objection. Counsel for Jackson stated:
During open argument, Mr. Smith [the prosecutor] stated to this jury that it is a violation of the law for [Jackson] to bring cigarettes and cell phones into the jail. Those are two separate crimes that Mr. Jackson is not charged with. And we feel that the jury will look at that and suggest that Mr. Jackson is guilty of these two acts, therefore he is *678 guilty of the third act of bringing drugs into the prison.
Mr. Smith is aware of the rules governing these particular issues and he knows he cannot discuss any prior bad acts or any acts of this nature during opening arguments or at any point, unless the Court allow such.
It is our position that Mr. Smith has tainted the jury, and we ask for an immediate mistrial on this matter.
The prosecution responded and said:
At the last trial of this case, [Jackson] testified that he brought cell phones and cigarettes to prisoners. We also would submit that under Rule 404(b), that allows other acts of misconduct to show motive, opportunity, intent, lack of mistake, that these acts would be admissible.
We would also argue that these are part of the corpus delicti, that it is impossible to separate these acts from bringing marijuana in, that they were done for money, and it is part of the case. I didn't realize that I had referred to them as crimes, because, quite frankly, I don't think they were crimes. What I should have said, it is a violation of the jail regulations. But I am a little surprised because [Jackson] testified last time before the jury that this was what he had done.
Counsel for Jackson stated that the then current trial was an entirely separate trial. Jackson's attorney concluded and said, "Mr. Smith blatantly made those comments and said those acts were illegal acts or criminal acts and it's a mistrial."
¶ 105. Here, Jackson's heading states that the circuit court erred when it overruled his motion for a mistrial, but his argument does not address that decision at all. Instead, Jackson only invokes M.R.E. 404(b). Because Jackson does not advance an argument regarding the circuit court's decision as it applies to his motion for mistrial, we will not discuss the merits of that particular issue. The circuit court overruled Jackson's objection "with certain caveats." The circuit court cautioned the prosecutor to refer to those acts not as "crimes," but as violations of jail regulations or something similar. The circuit court then brought the jury back into the courtroom and remarked as follows:
Mr. Smith, before you get started back on your opening statement, ladies and gentlemen, reference in opening statement was made by Mr. Smith to certain matters which he contended the evidence was going to show particularly, I think, regarding cigarettes and cell phones. Any reference to these should not be that they are any crimes, as such. They may or may not be violations of jail policy, as the evidence may show, but there should be no references to these as to any violations of the law or crimes.
The prosecutor concluded his opening statement without further incident.
¶ 106. We can find no reversible error as a result of the prosecutor's comment during opening statements. The prosecutor clearly stated that he did not intentionally refer to the clandestine acts of bringing cigarettes or cell phones to prisoners as "illegal" and the circuit court quickly admonished the jury that those acts may have been administrative violations of jail policy, but they were not illegal acts. See Yarbrough v. State, 911 So.2d 951 (¶ 18) (Miss.2005) (holding that, where the circuit court admonished the jury to disregard improper testimony or comments, that decision would not be reversible error "absent unusual circumstances" because jurors are presumed to follow a judge's instructions).
*679 ¶ 107. Additionally, Jackson's brief states that the prosecution "elicit[ed] testimony from Officer regarded [sic] prior bad acts of Mr. Jackson." Because many "officers" testified during Jackson's trial, at first glance, we were not certain as to just who "Officer" referred. Again, after review of the record, we can only discern that "Officer" refers to Officer Purser.
¶ 108. During direct examination, Officer Purser did not testify that Jackson brought cigarettes or cell phones to prisoners in the jail. Officer Purser testified that he found cigarettes on Watson and that Watson told him where he got the cigarettes. Officer Purser did not testify that Watson told him that Jackson brought him cigarettes or cell phones during attorney/client meetings.
¶ 109. Later, Officer Purser testified that, after Jackson's arrest, Jackson executed a waiver of rights document and consented to being questioned. When the prosecution asked Officer Purser to tell the jury what Jackson said regarding his transactions with Watson, Officer Purser testified:
Mr. Jackson stated that he did bring the cigarettes into the jail and he also he brought cell phones into the jail. He said the cigarettes were legal for him to bring in and he knew the cell phone wasn't, but the cigarettes were.
He was asked about the other object that he pulled out of his pocket. And he was asked what that was and he said that's inconclusive. He was asked again what do you mean, that's inconclusive. He said that's going to be inconclusive, the plastic bag that he handed to [Watson].
¶ 110. Jackson did not object to that testimony. Failure to make a contemporaneous objection at trial operates as a waiver of that issue on appeal. DeSalvo v. State, 776 So.2d 704 (¶ 20) (Miss.Ct.App. 2000). As such, this issue is procedurally barred.
¶ 111. Procedural bar notwithstanding, the evidence was admissible for multiple purposes. For one, it was necessary to show the jury the full and complete sequence of events. See Harris v. State, 907 So.2d 972 (¶ 15) (Miss.Ct.App.2005). Secondly, it was admissible as evidence of Jackson's motive of financial gain. M.R.E. 404(b). Additionally, it served as evidence of Jackson's opportunity during his attorney/client meetings with Watson. Id. As such, we find no error in the circuit court's decision to allow admission of the evidence at issue.
XIII. THE LOWER COURT FAILURE TO GRANT MOTION TO ADMIT PRIOR TESTIMONY OF UNAVAILABLE WITNESS UNDER M.R.E. RULE 804(a)(5) AND 804(b)(1).
¶ 112. In this issue, Jackson argues that the circuit court erred when it did not allow him to present Herbert Perkins's testimony from Jackson's first trial that ended in a mistrial. Jackson reasons that Perkins's prior testimony was admissible because Perkins was "unavailable" within the context of M.R.E. 804(a)(5). Further, Jackson submits that Perkins's prior testimony was admissible pursuant to the prior testimony exception listed under M.R.E. 804(b)(1). As mentioned, we review this issue under our familiar "abuse of discretion" standard.
¶ 113. "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c). "Hearsay is not admissible except as provided by law." M.R.E. 802. However, certain exceptions apply if the declarant is "unavailable" to testify. There are multiple ways in which a declarant may be *680 unavailable. One way a declarant may be found unavailable is if he or she is "absent from the hearing and the proponent of his statement has been unable to procure his attendance . . . by process or other reasonable means." M.R.E. 804(a)(5). If the declarant is unavailable as contemplated by M.R.E. 804(a)(5), then "[t]estimony given as a witness at another hearing of the same or a different proceeding . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination" is not excluded by the hearsay rule. M.R.E. 804(b)(1).
¶ 114. Accordingly, we must resolve this issue through a two-step process. First, we must determine whether Perkins was unavailable within the meaning of M.R.E. 804(a)(5). If Perkins was "unavailable," then we must resolve whether the exception listed at M.R.E. 804(b)(1) applies.

A. Whether Perkins was "Unavailable."
¶ 115. There is no question that Perkins was absent from Jackson's second trial. The record affirmatively shows that Perkins did not appear. The record further shows that, according to the return on Perkins's subpoena, Perkins was personally served on Friday, February 6, 2004. Jackson attempted to call Perkins as a witness on February 12, the fourth day of trial, yet Perkins never appeared. As discussed above, the circuit court issued a bench warrant for Perkins's arrest on February 11, but neither authorities nor investigators on Jackson's behalf were able to locate Perkins.
¶ 116. Without a doubt, Jackson attempted to procure Perkins's attendance, but he was not able to do so by process. As for whether Jackson attempted to secure Perkins's attendance by "other reasonable means," it appears that Jackson did. Reasonable means would seem to include further attempts at location. Jackson's attorney repeatedly informed the circuit court that his investigators constantly tried to locate Perkins. Additionally, the prosecution stipulated that Jackson made an effort to find Perkins. As such, we must find that Perkins was "unavailable" as contemplated by M.R.E. 804(a)(5).

B. Whether 804(b)(1) Applied.
¶ 117. Perkins testified during Jackson's first trial. The transcript of Perkins's testimony is included among the record. Perkins testified that he and Watson were both in jail at the same time. When authorities conducted "a random shakedown," they found marijuana on Watson. According to Perkins, Watson asked him to tell Officer Purser "that his lawyer was bringing him drugs to the jail so he could try to set him up and get released." Perkins also testified that Watson's sister took marijuana to a trustee named "Whit" and that "Whit" "used to bring [them] marijuana in the jail."
¶ 118. The precise issue is whether the circuit court should have allowed Jackson to present Perkins's prior testimony. Perkins first testified during Jackson's first trial, sometime between October 14 and 20. However, at the time of Jackson's second trial, nearly four months after Jackson's first trial, the transcript of Perkins's prior testimony had not been requested by Jackson and was not prepared. Though he knew as early as February 9, the first day of trial, that Perkins may not appear, Jackson never indicated that he asked a court reporter to transcribe Perkins's prior testimony. Jackson never attempted to submit an audio or video recording of Perkins's prior testimony. Jackson also never referenced an expectation as to how long it would take to have Perkins's prior testimony transcribed. Jackson never asked for a continuance to have a transcript prepared. *681 In any event, Jackson could not submit Perkins's prior testimony. Instead, Jackson attempted to submit testimony from two of his investigators. Jackson proffered testimony from Don Evans and Phillip Tucker.
¶ 119. In actuality, the circuit court never prohibited Jackson from presenting Perkins's prior testimony. At that time, it was impossible for Jackson to do so, as Perkins's prior testimony had not been transcribed. Jackson did not request that the audiotapes of Perkins's prior testimony be played to the jury. Rather, Jackson tried to submit testimony from two investigators who would have testified as to what Perkins told them. Jackson does not argue that the circuit court erred when it did not allow testimony from his two investigators.
¶ 120. The most harmful and significant portion of Perkins's prior testimony was that Watson asked him to tell Officer Purser that Jackson was bringing marijuana to Watson and that Watson intended to "set up" Jackson so that Watson could "get released." That is, Watson told Perkins to lie to Officer Purser. If Jackson's investigators attempted to testify that Perkins told them that Watson told him to lie, that testimony would be hearsay within hearsay. "Hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." M.R.E. 805. Jackson does not argue that either (a) the circuit court erred when it did not allow testimony from his investigators, or (b) each part of what would have been hearsay within hearsay conforms with an exception to the hearsay rule. Accordingly, we can find no abuse of discretion on the part of the circuit court.
XIV. THE TRIAL COURT ERRED IN ITS RULING THAT AN OPINION AS T[O] THE TRUGH [SIC] AND VERACITY OF THE INFORMANT AND PROBATION OFFICER ARE NOT ADMISSIBLE.
¶ 121. Jackson raises another allegation regarding the circuit court's decision to exclude evidence. Here, Jackson claims the circuit court erred when it prohibited Jackson's presentation of two witnesses, Herbert Perkins and Judge Mike Smith. Jackson submits that Perkins and Judge Smith should have been allowed to testify pursuant to Cooper v. State, 628 So.2d 1371 (Miss.1993).
¶ 122. In Cooper, the supreme court held that a circuit court erred when it did not allow a defendant to call witnesses who may have testified that, in his opinion, a paid confidential informant was characteristically untruthful. Id. at 1374. The rationale for the holding in Cooper was the language of M.R.E. 608(a). Pursuant to M.R.E. 608(a):
The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.
¶ 123. Jackson does not specifically cite M.R.E. 608(a). In any event, Jackson claims that "Perkins was offered by [Jackson] to testify as to the poor reputation for truthfulness of [Watson]." Further, Jackson claims that Judge Smith "would have testified of the conflict of John Purser and John Jackson and bias of John Purser against John Jackson." We will address Judge Smith and Perkins separately.

*682 A. Judge Smith
¶ 124. From the context of Jackson's argument and Jackson's cross-examination of Purser, it appears that Jackson attempted to show that Purser had some sort of vendetta against Jackson. Jackson cross-examined Purser at length over an instance involving Purser's preparation of pre-sentence investigation reports. Jackson claimed that he and Purser had an altercation over Purser's refusal to tender pre-sentence investigation reports during Jackson's representation of criminal defendants. Purser explained that he did not tender his pre-sentence investigation reports to Jackson because Judge Smith would not allow him to do so. Purser explained that, according to Judge Smith, he was to give his pre-sentence investigation reports to Judge Smith only, who would then give them to attorneys for a criminal defendant and the district attorney's office. Jackson argued that Officer Purser was not allowed to withhold pre-sentence investigation reports from an attorney who represented a criminal defendant. Officer Purser testified that he was merely following Judge Smith's instructions.
¶ 125. Regardless, Jackson seems to suggest that, as a result of that confrontation, Officer Purser wanted to "get" Jackson and that Officer Purser "got" Jackson when he initiated an investigation against Jackson. In effect, Jackson implies that Officer Purser lied about Jackson's involvement in smuggling marijuana into the jail. Jackson submits that the circuit court erred when it did not allow Judge Smith to testify regarding the confrontation between Officer Purser and Jackson. For multiple reasons, we find no error.
¶ 126. For one, Judge Smith had not been served with a subpoena to appear before the circuit court. Second, Jackson never argued that Judge Smith should have been allowed to testify as to Officer Purser's reputation for untruthfulness. As such, this issue is procedurally barred. Third, even if we assume that Judge Smith would have testified that Officer Purser was biased against Jackson based on their confrontation over pre-sentence investigation reports, that testimony would not be opinion evidence regarding Officer Purser's reputation for untruthfulness. Not that such testimony would or would not be admissible, but that is not the type of character evidence contemplated by M.R.E. 608(a) or Cooper. Finally, Jackson cross-examined Officer Purser at length. A significant portion of that cross-examination was on the subject of Officer Purser's confrontation with Jackson over pre-sentence investigation reports. Not only that, Jackson testified regarding his confrontation with Purser. Thus, the jury heard exactly the evidence Jackson claims the circuit court improperly excluded. Jackson could not have been prejudiced by prohibiting the same testimony from Judge Smith that both he and Purser testified about. Accordingly, we can find no reversible error.

B. Herbert Perkins
¶ 127. We have addressed the admissibility of Perkins's prior testimony at length. At no point did Jackson argue that Perkins's prior testimony was admissible pursuant to M.R.E. 608(a). We will not address an issue unless the circuit court has first had an opportunity to "pass on the question." Seeling, 844 So.2d at (¶ 18). Accordingly, this issue is procedurally barred.
XV. WHETHER THE SENTENCING CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT AND IS DISPROPORTIONATE UNDER EIGHTH AMENDMENT.
¶ 128. In his fifteenth and final issue, Jackson claims the circuit court's sentence *683 of three years in the MDOC's house arrest program or its intensive supervision program and fine of $25,000 was disproportionate and an example of unconstitutionally cruel and unusual punishment. Jackson claims that the circuit court judge "ignored all available options and sentenced [Jackson]" to an "excessive" sentence. Jackson suggests that this Court should reverse the circuit court and that "a more appropriate sentence should be imposed, that said matter should be dismissed." A fair interpretation of Jackson's brief indicates that, according to Jackson, the appropriate sentence for smuggling marijuana into a correctional facility is dismissal. That is patently absurd.
¶ 129. Jackson did not object to his sentence during sentencing or in his motion for new trial. Accordingly, this issue is procedurally barred. Ferrell v. State, 810 So.2d 607 (¶ 19) (Miss.2002). Procedural bar notwithstanding, this issue is meritless.
¶ 130. When sentences are within the guidelines provided for punishment by the legislature, they will not be considered cruel and unusual punishment. Id. at (¶ 20). Jackson was convicted under Miss.Code Ann. § 47-5-198(1). One who violates that section may be fined up to $25,000 and sentenced to "imprisonment for not less than three (3) years nor more than seven (7) years; and the person is not eligible for probation, parole, suspension of sentence, earned time allowance or any other reduction of sentence." Miss.Code Ann. § 47-5-198(3). The circuit court sentenced Jackson to three years of ISP-otherwise known as house arrest-and ordered Jackson to pay a $25,000 fine. The circuit court also ordered Jackson disbarred. The idea that Jackson's sentence is cruel and unusual is ludicrous and approaches frivolity. The circuit court sentenced Jackson to the maximum fine and the minimum sentence, yet both were within the statutory limits. Further, as the State notes, "Jackson is allowed to serve his sentence at his own home, to leave his home to work, and to see to his necessary chores and tasks." "Sentencing is within the complete discretion of the trial court and not subject to appellate review if it is within the limits prescribed by statute." Gibson v. State, 731 So.2d 1087 (¶ 28) (Miss.1998). There is nothing cruel nor unusual about Jackson's sentence.
¶ 131. Incidentally, Jackson benefits through what appears to be legislative oversight as well as significant judicial restraint. Marijuana is a Schedule I controlled substance. Miss.Code Ann. § 41-29-113(c)(14) (Rev.2005). Mississippi Code Annotated Section 41-29-139(a)(1) (Rev.2005) sets forth that it is illegal to sell or transfer a controlled substance. Further, where one sells or transfers less than thirty grams of marijuana, upon conviction, that person may be "imprisoned for not more than three (3) years" or fined up to $3,000, or both. Miss.Code Ann. § 41-29-139(b)(3). Jackson was not convicted under Section 41-29-139. Instead, Jackson was convicted under Miss.Code Ann. § 47-5-198, which makes it illegal to sell, bring in, or possess a controlled substance in a correctional facility or county jail, among other places. Jackson would not be allowed to serve his sentence on house arrest had he been convicted under Section 41-29-139. Miss.Code Ann. § 47-5-1003(1) (Rev.2005). Section 47-5-1003(1) states that "[a]ny offender convicted of . . . a felony violation of Section 41-29-139(a)(1) shall not be placed in the [intensive supervision] program." Accordingly, the prohibited those convicted for selling or transferring controlled substances from serving their sentences on house arrest. As such, it seems inconsistent with the *684 legislature's intent that one may not sell controlled substances and be sentenced to house arrest, but one may sell or transfer controlled substances in a correctional facility and then be sentenced to house arrest. Regardless, that is exactly what happened here. In any event, it is absolutely clear that the circuit court was more than lenient with Jackson.
¶ 132. Finally, Jackson seems to claim that his sentence was disproportionate. However, as Jackson's sentence was within the applicable statutory guidelines, an extended analysis of the three-prong factors detailed in Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) is unnecessary. Gibson, 731 So.2d at 1097 (¶ 29). Accordingly, we affirm.
¶ 133. THE JUDGMENT OF THE AMITE COUNTY CIRCUIT COURT OF CONVICTION OF SALE OF MARIJUANA WITHIN A CORRECTIONAL FACILITY AND SENTENCE OF THREE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, FINE OF $25,000 AND DISBARMENT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR. KING, C.J., AND IRVING, J., NOT PARTICIPATING.